

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00500-CV

Frank Thomas **SHUMATE**, Jr.,
Appellant

v.

**WILDLIFE PARTNERS, LLC**,
Appellee

From the 451st Judicial District Court, Kendall County, Texas
Trial Court No. 22-241
Honorable Kirsten Cohoon, Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice

Sitting:    Rebeca C. Martinez, Chief Justice
H. Todd McCray, Justice
Velia J. Meza, Justice

Delivered and Filed: November 26, 2025

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

Appellant Frank Thomas Shumate, Jr. agreed to sell and deliver to appellee Wildlife Partners, LLC four female kudu for $36,000 apiece, paid before delivery. One was delivered dead and another, according to Wildlife, died forty-eight hours after delivery. Shumate refused to refund Wildlife $72,000 for the two deceased kudu. Wildlife then sued Shumate for, among other things, violations of the Texas Theft Liability Act ("TTLA"), *see* TEX. CIV. PRAC. & REM. CODE ANN. § 134.003(a), and fraud. The trial court's final judgment, in accordance with the jury's

verdict and Wildlife's election of remedies, awards Wildlife $72,000 in actual damages on its TTLA claim, *see id*., $1,000 under Section 134.005 of the Texas Civil Practice and Remedies Code, *see id.* § 134.005, $200,000 in exemplary damages, and $365,000 in aggregate attorney's fees. In nine issues, which we reorganize and classify as five, Shumate argues that: (1) the statute of frauds bars all of Wildlife's claims, *see* TEX. BUS. & COM. CODE ANN. § 2.201; the evidence is legally and factually insufficient to support the jury's findings on Wildlife's (2) TTLA and (3) fraud claims; (4) the jury's award of actual and exemplary damages was in error; and (5) the jury's award of attorney's fees is legally insufficient. We affirm in part and reverse and remand in part.

### I. BACKGROUND

**A. First Sale**

At trial, Brial Gilroy, the CEO of Wildlife, testified that on February 21, 2022, Wildlife agreed to purchase two female kudu from Shumate. Gilroy negotiated the sale with Ricardo Garcia, an employee of one of Shumate's companies. The next day, Garcia inquired about payment, and he and Gilroy agreed to exchange a check around the time Shumate would deliver the kudu. Gilroy explained that no one at Wildlife participated in the capture of the two kudu at Shumate's ranch, and the trailer that transported them was not owned by Wildlife. Instead, it was Gilroy's understanding that Shumate arranged for the kudus' delivery. The two kudu, however, died by the time the trailer transporting them reached Wildlife's ranch. Gilroy did not pay for the two kudu that perished during transport.

**B. Second Sale**

On February 25, 2022, Garcia texted Gilroy an offer to sell four of Shumate's female kudu. Gilroy agreed on a price of $36,000 apiece. Gilroy and Garcia discussed Shumate's insistence on pre-payment through text messages that provide:

GILROY:     Why am I paying prior to delivery?  I don't mind paying the day of[.]

GARCIA:     He prefers to get paid in advance when it comes to the kudu.

. . .

GILROY:     Did you tell him they're coming to me[.]

GARCIA:     I will when I speak to him, we've been texting only.  He's never had any issues with my buyers throughout the years all payments have always been in full.  But he says he's had several bad experiences in the past so he plays it safe by collecting in advance.

GILROY:     Ok[.]  I understand[.]  The issue is that I'm paying you not him[.]  If something goes sideways[,] I have no deal with him[.]

GARCIA:     You can make payment to him[.]  I won't hand him payment till the animals are delivered for that same reason.  Things go sideways[,] I can refund the buyer their money back.  But you can write [the] check to him.

. . .

GARCIA:     Will you send pay [sic] payment via wire?  Tom will be arriving tomorrow afternoon and will dart kudu Thursday or Friday pending weather.  He's asked me a couple times if I have picked up check.  Mentioned you wanted to wait till closer to delivery. . . . Can send to him directly, just let me know so I can have him confirm.

GILROY:     I'll wire.

On the morning of March 10, 2022, Garcia texted Gilroy, "[l]et me know when you send wire so we can get to darting."  Gilroy replied "I'm on it."  The afternoon of March 10, Garcia again asked, "[d]id you send wire[?]"  On the morning of March 11, Garcia inquired, "[u]pdate[?]"  Gilroy then texted a screenshot showing the $144,000 wire transfer to Shumate's bank account.  Garcia answered, "[t]hank you[.]  We'll dart when the weather passes[.]"

**C.     Delivery of Second Sale**

Shumate testified that he personally tranquilized the four kudu on the morning of March 16, 2022.  Shumate also testified that he ensured that each of the four kudu were awake and alert enough to travel before the trailer transporting them left his property.

Robert Tullos, an animal delivery driver employed by Shumate, testified that he arrived at Shumate's ranch near Falls City, Texas between 6:30 and 7:00 a.m. on March 16, 2022.  The animals had already been loaded into a trailer by the time Tullos arrived, and he departed with them for Wildlife's ranch between 7:00 and 7:30 a.m.  Tullos admitted that he never saw Shumate the morning of March 16.  Moreover, Tullos had never seen Shumate tranquilize any kudu at night, and he acknowledged that tranquilizing kudu is usually done during the daytime.

On March 16, 2022, the trailer Tullos operated arrived at Wildlife's ranch in Carrizo Springs, Texas.  Gilroy was out of state at the time of delivery.  Luis Garza, a Wildlife employee, facilitated the delivery.  Garza informed Brian Henderson, the ranch manger, who in turn informed Gilroy, that one kudu had died in transit, one was exhibiting symptoms of "capture myopathy," and two appeared healthy.  Gilroy called Garica and informed him that Wildlife would not accept delivery of the kudus that were deceased and ill.  According to Gilroy, "[Garcia] assured me that they would stand behind the kudu and that they would be warrantied for some reason if something went wrong."  Gilroy had no reason to disbelieve Garcia's representations.  The two healthy kudu and the one exhibiting symptoms were released into a special area designated for animals arriving onto Wildlife's ranch.  Tullos recalled the kudu who had been exhibiting symptoms was, when he looked in her compartment, laying on the floor.  However, upon the compartment door being opened, she "stood up, jumped, and took off running like a scolded dog."  According to Gilroy, the kudu that had been exhibiting symptoms died within forty-eight hours after being released.

**D.      Dispute**

On March 24, 2022, Gilroy texted Shumate, "Tom [Shumate] please give me call. I would like to seek an amicable resolution to the issues related to the kudu. I'll be available today." No response from Shumate is noted in the text message string. Then, on March 26, 2022, Gilroy again texted Shumate:

> I have called you twice and left voicemail. I have also texted attempting to communicate. If your solution is to ignore me, I can simply seek a remedy via the courthouse. That is not my desire, but you can be assured, I'm not going to go away over this issue. You can choose to be reasonable or obstinate. If you want to incur legal fees, you're welcome [] to choose that path. As a businessman with significant legal experience, I would think you'd have learned by now that path isn't useful.
>
> Tom, I'm a fair and reasonable person, but I'm not going to [g]et robbed of $70[k.]
>
> I will wait until Monday to resolve the issue. If you ignore me further, I'll file suit next week.

Shumate and Gilroy then texted:

> SHUMATE:     [S]ay's nothing about a warranty or guarantee. You want to sue Ricky [Garcia] sounds like. I [will] let him know[.]
>
> GILROY:      Surely you are more reasonable than the way you're acting. As I said, I will wait until Monday. If you decide to handle this is [sic] a reasonable manner great. If not, I have no say in that.
>
> I'm an honorable guy[,] and I have done nothing to you. I paid you in full and communicated the problem with the kudu prior to it being unloaded by your driver. I understand your frustration related to numerous kudu dying. I'm not to blame for that and it's unreasonable that you'd direct your frustration at me.
>
> Tom it's unfortunate to lose any animal, but you're wrongly attempting to put a loss I didn't cause on me.
>
> SHUMATE:     What is your email address or attorney[']s name so I can just let the attorneys handle it.

In another series of text messages, Gilroy and Shumate texted:

GILROY:   Ricky was called before unloading[.]  He was calling you[.]  This is not a complicated issue[.]  Either you'll do what any reasonable person would do or you won't[.]

SHUMATE:   I guess you need to call all the people I bought animals from a[n]d ask them to replace the dead ones.  Lol[.]  Like I said[,] [i]f you want to say I f----- [you][,] I will make sure to not make a liar out of you[.]

GILROY:   I'm not the people you bought from[.]  Tom[,] does it make you feel tough to talk that way[.]

SHUMATE:   You are miss [sic] understanding.  Has nothing to do with being tough[.]

GILROY:   It's no misunderstanding[.]  You delivered 6 kudu[.]  4 are dead[.]  Your guy was told not to unload by my manager[.]  Ok two day[.]  Tom again[,] [y]ou know what's reasonable and fair[.]  I cannot make you do anything[.]  Either you do what's right or you don't[.]

SHUMATE:   Like I said do t [sic] make yourself a liar if you are going to say I f------ you[.]

GILROY:   The animal is dead.  I paid you.  If you think it's ok to not refund or replace that's on you[.]  Tom[,] I'm going to say 4/6 kudu delivered are dead[.]  That's a fact[.]  Your guy was told of the issue before unloading[.]  Ricky was called before unloading[.]  He was calling you . . . .  We did not tell him to unload[.]  No [sic] you didn't want to sell to me because Hunter screwed your. [sic]  Right now you're trying to screw me.

SHUMATE:   No the kudu was laying down in the trailer[,] which they all do.  It got up and ran off with no problems

GILROY:   And if that['s] who you are that's on you[.]

SHUMATE:   Call me what you want.  But don't make a liar out of yourself[.]

GILROY:   I don't need to call you anything.  You're trying to screw me[.]  Your guy was told that the kudu had an issue[.]  Clearly it did.  It's dead: You sold me a kudu and it died less than a day later.  I called you, Ricky called you, my guy called me and your guy was told it was hurt.  This isn't hard to understand unless you're trying to avoid dealing with . . . .

At trial, Gilroy insisted that "[Garcia] assured me that *they* would stand behind the kudu and that *they* would be warrantied for some reason if something went wrong." (Emphasis added). On Shumate's cross examination of Gilroy, he was asked and answered:

> Q. My question, sir, again, is what were the terms of the warranty that you claim Mr. Shumate offered to you prior to delivery?
>
> A. My interactions were with Ricky Garcia, not directly with Mr. Shumate. However, I did have a conversation with Mr. Shumate throughout the process. So what I was purchasing was *healthy*, mature female kudu. So the warranty that I was initially given was that I would receive *healthy*, mature female kudu delivered to my ranch.
>
> Q. So isn't it true that the warranty only was until the kudu were delivered to your property? Isn't that correct?
>
> A. The initial element of this is — that is correct. It did extend beyond that due to an additional conversation.
>
> Q. Sir, I'm talking about prior to delivery, what was the warranty that was offered?
>
> A. That I would receive *healthy*, mature female kudu.

(Emphasis added).

## E. Gilroy's Opinions

Gilroy believed that two of Shumate's capture and transportation methods contributed to the kudu developing lethal "capture myopathy." First, Gilroy described, over Shumate's objection,[1] capture myopathy as:

> Capture myopathy is generally considered to be the leading cause of death during animal capture and transport. It is the equivalent of a panic attack in a wild animal. And the stress associated with — the stress associated with being captured causes the animal to produce ultra[-]high body temperature, which causes them to suffer the equivalent of a heat stroke. They lose the ability to regulate their body

---

[1] Shumate objected on the ground that Gilroy's opinion on capture myopathy constituted an expert opinion and that Gilroy, not being a licensed veterinarian, was unqualified to opine on the topic. The trial court overruled Shumate's objection, and he does not challenge that ruling before us.

temperature. Oftentimes capture myopathy results in death within two to three hours, but it can take up to two weeks for the animal to die.

In essence, the animal loses the ability to move its body. It's alive. It's awake. It's sitting there looking at you. But its muscles are no longer working. They are having myopathy is essentially what's going on within their muscles.

Gilroy has dealt with capture myopathy "countless" times, and in his experience, it is irreversible.

Second, Shumate tranquilized the kudu for capture and transport using "BAM," which is short for a mixture of Butorphanol, Azaperone, and Medetomidine. Gilroy opined that Thionyl is a better tranquilizer than BAM because Thionyl is an opiate whose effects are capable of being reversed. In Gilroy's experience, kudu experience significantly lower levels of stress when tranquilized with Thionyl versus other drugs.

Gilroy reconciled Shumate's testimony that he tranquilized the kudu during the day with Garza's testimony that when he arrived between 6:30 and 7:00 a.m. on March 16 to mean that Shumate in fact tranquilized the kudu during the day on March 15 and left them in the trailer overnight. Gilroy explained:

Well, it would explain why so many kudu out of these deliveries died. If that's what's going on, the environmental stress associated with catching those animals, leaving them on a trailer — I don't see how it took from 7:00 in the morning until 5:00 in the afternoon to drive three hours.

And so this whole series of information around when they were caught and how they were caught and when they were picked up, when I piece it together, it tells me that these animals were caught the day before, they were left on a trailer overnight, they sat on that trailer throughout the course of the day while something was going on that ranch, and at some point someone left that ranch and drove to Carrizo Springs or drove somewhere else and they arrived somewhere around 5:00 in the afternoon, maybe 4:00 in the afternoon because there were a series of phone calls. So that would put these animals being on that trailer for close to 24 hours. And that would explain why capture myopathy was occurring to these animals.

Gilroy believed that Shumate's loss of a total of four — out of six — kudu over an approximately three-week span was "extraordinary." He opined that "a standard dead loss when capturing these

kinds of animals for people that are skilled and have experience doing this is less than 3 percent, 3 to 4 percent maybe, somewhere in that range." Gilroy elaborated that Shumate's loss rate is "an astronomical number" and "you cannot succeed in this industry" with such a loss rate. In Shumate's case, according to Gilroy, two-thirds of the kudu that he attempted to deliver to Wildlife died from capture myopathy.

**F.     Verdict, Judgment, & Post-Judgment Motions**

Before trial, the parties filed a joint pretrial order that stipulated, "Plaintiff and Defendant Shumate, by and through agent Defendant Garcia, entered into an agreement wherein Plaintiff agreed to purchase from Defendant four (4) kudu for $144,000.00 with the price of each kudu being $36,000.00."

Wildlife tried to a jury its claims of breach of contract, breach of warranty, fraud (which globally included theories of material misrepresentation and fraud by non-disclosure), negligent misrepresentation, money had and received, and alleged violations of the TTLA against Shumate. The jury also considered Garcia's liability regarding only Wildlife's fraud and negligent misrepresentation claims. The jury answered in Wildlife's favor and against Shumate on all claims. The jury did not find Garcia liable on either Wildlife's fraud or negligent misrepresentation claims. Wildlife elected to recover on its TTLA claim. The trial court, in accordance with the jury's verdict, signed a final judgment that awards Wildlife $72,000 in actual damages on its TTLA claim, $1,000 under Section 134.005 of the Texas Civil Practice and Remedies Code, $200,000 in exemplary damages, and $365,000 in aggregate attorney's fees.

Shumate filed motions for a judgment notwithstanding the verdict and for a new trial. These motions were denied by operation of law. Shumate timely appealed.

**II. Statute of Frauds**

Shumate's first issue argues that the statue of frauds bars all of Wildlife's claims, including Wildlife's TTLA and fraud claims, because each kudu cost $36,000 and there was no written contract. The relevant provision of the statute of frauds provides:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

TEX. BUS. & COM. CODE ANN. § 2.201(a). Relatedly, Shumate argues that he "repeatedly asserted a statute of frauds objection to Question [No.] 1[, relating to Wildlife's breach of contract claim,] because no signed writing showed he promised to sell 'four healthy female kudu.'" Referencing *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013), Shumate further argues that "[s]ince [he] established the statute applied, the burden was on Wildlife to plead and secure jury findings on an exception."

Wildlife responds by arguing that an exception in the statute of frauds applies, directing us to a provision providing that "[a] contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable . . . with respect to goods for which payment has been made and accepted . . . ." TEX. BUS. & COM. CODE ANN. § 2.201(c)(3). Wildlife argues that "[i]t is undisputed that Shumate accepted full payment for the four kudu prior to delivery." It directs us to a passage in its live answer wherein it alleged that before the kudu were delivered, it "wired the Purchase Funds to Defendant Shumate's bank." Later in Wildlife's answer and in relation to its breach of contract claim, Wildlife alleges that the agreement "concerning the purchase and delivery of the [k]udu is a valid, enforceable contract" and that it "performed its contractual obligations under the [a]greement by paying for the four (4) [k]udu in advance of

delivery." In the "Stipulated Facts" section of the parties' joint pretrial order, *see* TEX. R. CIV. P. 166, the parties stipulated that "Defendant Shumate received a wire transfer of $144,000.00 for the purchase of four (4) kudu at $36,000.00 per kudu on March 11, 2022, prior to delivery."

Shumate's argument fails to appreciate that Wildlife pleaded — and Shumate stipulated to — facts that brought Wildlife's claims within an exception to the statute of frauds. *See Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980) ("A judicial admission[, such as the stipulations of the parties,] is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it."); *see also Bakke Dev. Corp. v. Albin*, No. 04-15-00008-CV, 2016 WL 6088980, at *2 (Tex. App.—San Antonio Oct. 19, 2016, no pet.) (mem. op.) ("[W]hether the circumstances of a particular case fall within an exception to the statute of frauds . . . is generally a question of fact.").

We overrule Shumate's first issue.

### III. TEXAS THEFT LIABILITY ACT CLAIM

Shumate's second issue advances three arguments challenging the legal and factual sufficiency of the evidence supporting the jury's verdict on Wildlife's TTLA claim.

#### A. Standards of Review

"In a legal sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded fact finder to reach the verdict under review." *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "Evidence is legally insufficient to support a . . . finding when[:] (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the

opposite of a vital fact." *Gunn*, 554 S.W.3d at 658 (citations omitted). More than a mere scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id*. (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)). Conversely, less than a scintilla of evidence exists when the evidence offered to prove a vital fact's existence is "so weak as to do no more than create a mere surmise or suspicion." *Id*. (quoting *King Ranch*, 118 S.W.3d at 751). All the record evidence must be considered in the light most favorable to the party in whose favor the verdict has been rendered — "every reasonable inference deducible from the evidence is to be indulged in that party's favor." *Id*. (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

In reviewing a factual-sufficiency challenge to a finding on an issue on which the appellant did not have the burden of proof, we will set aside the verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding in our factual sufficiency review. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We must weigh all the evidence, not just that evidence which supports the verdict. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Mar. Overseas Corp.*, 971 S.W.2d at 406–07. If we determine that the evidence is factually insufficient to support the jury's findings, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow Chem. Co.*, 46 S.W.3d at 242.

Whether reviewing the legal or factual sufficiency of the evidence, the factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819.

**B.**      **Applicable Law**

To prevail in a Texas Theft Liability Act suit, a plaintiff must obtain a finding that the defendant committed theft as defined in specified sections of the Texas Penal Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.002(2), 134.003(a). The jury question and definitions on Wildlife's TTLA claim, submitted without objection,[2] provide:

> Did Frank Thomas Shumate, Jr. commit theft of Wildlife Partners, LLC's property? Frank Thomas Shumate, Jr. committed theft if he—
>
> > 1.      appropriated property; and
> > 2.      the appropriation was without the effective consent of the owner; and
> > 3.      Frank Thomas Shumate, Jr. intended to appropriate the property.
>
> "Property" means:
> > 1.      a document, including money, that represents or embodies anything of value.
>
> Frank Thomas Shumate, Jr. appropriates property if he—
> > 1.      acquires the property; or
> > 2.      otherwise exercises control over the property; or
> > 3.      brings about a transfer or purported transfer of title or any other nonpossessory interest in the property, whether that transfer or purported transfer is to Frank Thomas Shumate, Jr. or another.
>
> Frank Thomas Shumate, Jr. intended to appropriate the property if he had the conscious objective or desire to—
>
> > 1.      withhold the property from the owner permanently; or
> > 2.      withhold the property from the owner for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner; or
> > 3.      restore the property only on payment of reward or other compensation; or
> > 4.      dispose of the property in a manner that makes recovery of the property by the owner unlikely.

---

[2] "Our review is restricted to the jury charge as submitted when there was no objection to the instruction." *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407 (Tex. 2016).

**B.**     **Analysis**

Shumate first argues that the jury charge included an "inapplicable theory" of theft that is limited to only the $144,000 that Wildlife wired to Shumate before delivery of the four kudu on the second sale. Wildlife argues that Shumate's "inapplicable theory" contention fails because he did not preserve any complaint related to the theft question. Indeed, Shumate fails to direct us to any portion of the jury charge conference wherein he objected to the theft question being submitted on an "inapplicable theory." *See Lowry v. Tarbox*, 537 S.W.3d 599, 617 (Tex. App.—San Antonio 2017, pet. denied) ("Because appellants failed to present the same challenge on appeal as they did in their objections to the jury charge, the alleged error has been waived for appeal.").

Shumate next argues there is no evidence that, at the moment he accepted Wildlife's $144,000 pre-payment, he intended to unlawfully appropriate the pre-payment without Wildlife's effective consent. Shumate references *Peterson v. State*, 645 S.W.2d 807, 811 (Tex. Crim. App. 1983) (op. on reh'g), for its holding that "[r]elevant intent to deprive the owner of property is the accused's intent at the time of the taking." Wildlife references our opinion in *Perez v. State*, 437 S.W.3d 610, 618 (Tex. App.—San Antonio 2014, no pet.), for its holding that "[i]ntent may be inferred from the circumstances." *See also Nobel Leaf Holdings LLC v. First United Bank*, No. 07-24-00176-CV, 2025 WL 2406110, at *5 (Tex. App.—Amarillo Aug. 19, 2025, no pet.) (mem. op.) ("Intent must exist at the moment of appropriation and can be inferred from the defendant's conduct and surrounding circumstances."); *Torres v. State*, No. 04-12-00752-CR, 2013 WL 5942605, at *3 (Tex. App.—San Antonio Nov. 6, 2013, pet. ref'd) (mem. op., not designated for publication) ("[I]n determining culpability for an offense, a jury may consider events occurring before, during, and after the offense.") (quoting *In re I.L.*, 389 S.W.3d 445, 456 (Tex. App.—El Paso 2012, no pet.)). Specifically, Wildlife argues that Shumate knew "his kudu would likely die

in transit, Shumate required payment in advance, refused to refund the money for the dead kudu, then lied about the circumstances of their capture and transfer."

There are four pieces of evidence supporting the jury's finding that Shumate possessed the requisite intent. First, Shumate made no money from the first sale in February 2022 because both kudu died in transit and the agreement called for essentially contemporaneous payment. Second, the jury may have found that Garcia's repeated texts to Gilroy inquiring about his prepayment evidenced a fixation on Garcia's and Shumate's part with prepayment. Third, Gilroy testified that the industry loss rate is between three and four percent. Nevertheless, all of the kudu in the February 2022 sale died in transit and half of the March 2022 sale eventually died. Gilroy also testified that the tranquilizer Shumate used and the length of time that the four kudu spent in the trailer before Tullos transported them increased the amount of stress that they were under and by extension the risk for developing capture myopathy. Fourth, after the March 16, 2022 delivery, Shumate did not refund the money for the kudu that arrived dead and the one that died within forty-eight hours. Instead, he ignored Gilroy's text messages for several days, and when Shumate engaged, he taunted Gilroy, texting "[i]f you want to say I f----- [you][,] I will make sure to not make a liar out of you[.]" All of this evidence considered in the light most favorable to the verdict means that the jury may have reasonably found that Shumate knew it was likely that not all the kudu would be delivered alive, and therefore, he insisted on prepayment so as to not lose out as he did on the February 2022 sale.

Shumate's third argument is that his refusal to refund $36,000 for the kudu that died upon release is merely evidence of a commercial dispute — not theft. Shumate references *Hesbrook v. State*, 194 S.W.2d 260, 262 (Tex. Crim. App. 1946), for its holding that "[t]he mere fact that one fails to return or pay back money after failing to perform a contract, for the performance of which

the money was paid in advance, does not constitute theft." Wildlife references *Glenn v. State*, No. 01-07-00445-CR, 2008 WL 2548810, at *5–6 (Tex. App.—Houston [1st Dist.] Jun. 26, 2008, no pet.) (mem. op., not designated for publication), for the proposition that a party's withdrawal of consent and the possessor's refusal to return property is legally sufficient evidence of theft. In *Glenn*, a title company appropriated funds from an unrelated party to the defendant's real estate transaction and provided excess funds to the defendant. *Id*. at *5. When the title company discovered the mistake, it asked for a refund from the defendant. *Id*. The defendant, in a recorded telephone conversation, informed the title company that he would not refund the money and that he had gotten a "free house." *Id*. at *6. The First Court of Appeals held that "the jury could have reasonably concluded that, by actually depriving [the title company's president] of the funds at issue and refusing to take steps to begin returning those funds when notified of the error, appellant intended to deprive the owner, [the title company's president], of those funds." *Id*.

Shumate's reliance on *Hesbrook* is misplaced. The passage in *Hesbrook*, 194 S.W.2d 261–62, that Shumate relies on relates to the appellant's contention that there was no evidence of pretext. The "contract" in *Hesbrook* was that the appellant would relieve the complainant's son of his service in the U.S. Army in Italy during World War II and return him home for $400, paid over two equal installments. *Id*. at 261. The analysis in *Hesbrook* focused on the lack of evidence that the promise made by the defendant was false when the defendant made it. *Id*. at 262. In this case, Shumate makes no sufficiency challenge related to false pretext. Instead, he challenges the sufficiency of the intent element, which we have already addressed. We hold that Shumate's refusal to refund the $72,000, coupled with the four pieces of evidence discussed above indicating Shumate's intent, is legally and factually sufficient evidence to support the jury's verdict on Wildlife's TTLA claim.

We overrule Shumate's second issue.

### IV. FRAUD BY MATERIAL MISREPRESENTATION

To prevail on a fraud by material misrepresentation claim, a plaintiff must show: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (internal citations and quotation marks omitted). The fourth element has two requirements: the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable. *Id*. Shumate's third issue challenges the legal and factual sufficiency of the evidence supporting the first and fourth elements.

### A. Knowing Material Misrepresentation

Regarding the first element of fraud by material misrepresentation, Shumate argues that he should not be held liable for any misrepresentation that Garcia may have made because the jury found that Garcia did not commit fraud. Specifically, Shumate complains that there is no evidence he made a misrepresentation with knowledge of its falsity or made such a representation recklessly. Shumate emphasizes that the evidence shows Gilroy communicated with only Garcia on March 16, 2022.

Wildlife emphasizes that, in the joint pretrial order, Shumate stipulated Garcia was his agent. *See Nahm v. J. R. Fleming & Co.*, 116 S.W.2d 1174, 1176 (Tex. App.—Eastland 1938, no writ) ("What a principal does through an agent he does himself."). Indeed, Gilroy testified that "[Garcia] assured me that *they* would stand behind the kudu and that *they* would be warrantied for

some reason if something went wrong." (Emphasis added). Wildlife also argues that Shumate's argument fails to appreciate his own statements before the kudu were delivered on March 16. It directs us to Shumate's cross examination of Gilroy wherein he stressed that Shumate himself promised Wildlife "*healthy*, mature kudu."

Relatedly, Shumate asserts that "Gilroy admitted the parties agreed the risk of loss shifts when animals leave the trailer." Shumate references his cross examination of Gilroy, wherein Gilroy testified:

> Q.     I'm trying to find out, besides deceased kudu, okay, I'm talking about when a kudu is alive, gets up and jumps out of the trailer, do you consider that to be unloaded at that point in time for the living kudu?
>
> A.     I would say that the definition of unloaded fits within that description, yes.
>
> Q.     Okay. And you agree that the risk then shifts to the buyer once that kudu is off the trailer running off?
>
> A.     Assuming that the other terms of the agreement have been met, I would agree with that.

Shumate does not appreciate Gilroy's testimony immediately after this exchange, which provides:

> Q.     Well, what other terms of the agreement are you talking about, sir?
>
> A.     Well, I purchased *healthy* kudu, and it would be required that the animals unloaded are healthy in order for those animals to transfer to my responsibility.

(Emphasis added).

In reconciling the jury's finding that Garcia did not commit fraud, the jury may have found that Garcia was speaking as Shumate's agent — in accordance with the stipulation in the joint pretrial order — when he "warrantied" the kudu that appeared in distress and perished forty-eight hours after it was released.[3] The jury also may have found that Garcia intended for Shumate to

---

[3] Wildlife also argues that Shumate neither argued nor secured a jury finding that Garcia exceeded his authority in warranting the kudu that appeared in distress.

follow through on the warranty that he conveyed on Shumate's behalf but that Shumate did not intend to follow through on that warranty, as with the initial promise to deliver "*healthy*, mature kudu."

## B.    Actual, Reasonable, and Justifiable Reliance

Shumate primarily relies on *Orca Assets* for his two reliance arguments.  In *Orca Assets*,

> a company formed by an experienced oil-and-gas businessman signed a lease for land that had already been leased to another.  [*Orca Assets*, 546 S.W.3d] at 650, 652.  The company sued the lessor's agent, JPMorgan, for fraud and negligent misrepresentation, alleging that it had justifiably relied on JPMorgan's statements that the land was open.  *Id.* at 654.  JPMorgan argued that the company's claims were negated as a matter of law because the company could not have justifiably relied on statements that the land was open considering the number of red flags present.  *Id.* at 654–55.  [The Texas Supreme Court] agreed, concluding that a letter of intent, which placed the responsibility on the plaintiff to investigate title and contained a negation-of-warranty provision, directly contradicted the representations on which the plaintiff allegedly relied.  *Id.* at 659.  [The Texas Supreme Court] concluded that this direct contradiction together with other red flags and the company's sophistication in the oil-and-gas industry negated the company's justifiable reliance on the alleged misrepresentation.  *Id.* at 660.

*Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 558 (Tex. 2019).

First, Shumate argues that Wildlife is sophisticated in every aspect of the exotic animal business compared to Garcia, who Shumate describes as "a low-level employee of Superior Ready Mix," one of Shumate's companies.  Wildlife responds by highlighting Shumate's stipulation that Garcia was his agent and that Shumate's unequal sophistication argument fails to account for Shumate's twenty years of experience buying and selling exotic animals.  We conclude that for purposes of an *Orca Assets* analysis Wildlife and Shumate were equally sophisticated.

Second, Shumate argues that Wildlife acted unreasonably as a matter of law by relying on Garcia's "vague oral modification of Shumate's oral agreement."  Relatedly, Shumate argues that there were red flags of: (1) ambiguous representations; (2) contradicted representations; (3) unenforceable representations, referencing Shumate's failed statute of frauds defense; (4) risky

representations; and (5) disproportionate consequences. Again, Shumate primarily references Gilroy's isolated acquiesce to his question regarding Wildlife being responsible for the distressed kudu when it exited Shumate's trailer. Gilroy expressly clarified that "I purchased healthy kudu, and it would be required that the animals unloaded are healthy in order for those animals to transfer to my responsibility." Garcia's "warranty" does not equal the "contradiction" in *Orca Assets* because Gilroy's and Shumate's agreement was that the kudu would be "healthy." The jury may have determined that a healthy kudu is one that had not developed capture myopathy.

We overrule Shumate's third issue.[4]

## V. DAMAGES

In Shumate's fourth issue, he challenges the final judgment's award of actual damages, raising one argument, and exemplary damages, raising five arguments.

### A. Actual Damages

Shumate argues that the jury's award of damages for breach of contract, breach of warranty, fraud, and negligent misrepresentation was inappropriately keyed to benefit of the bargain and that it should have been keyed to market value.[5] Wildlife argues that, among other things, Shumate did not object to the measure of damages used in any question. *See Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007) ("[Respondent] failed to preserve error to challenge the measure of damages the jury was instructed to use. Thus, damages are measured by the question and instruction given."). The measure of damages for Wildlife's TTLA claim was "[f]unds that Wildlife [] paid for property (*i.e.*, the kudu) it did not receive." The jury answered

---

[4] The fraud question included theories of fraud by material misrepresentation and fraud by nondisclosure. *See Butler v. Collins,* 714 S.W.3d 562, 565 n.2 (Tex. 2025) ("A fraud claim requires proof of a false, material representation (or failure to disclose information that the party has a duty to disclose) . . . ."). Because of our disposition as to the material misrepresentation theory, we need not address Shumate's challenge to the sufficiency of the evidence on Wildlife's failure to disclose theory.

[5] Specifically, Shumate argues that "Wildlife offered no evidence of the market value of the hides and meat from the two deceased kudu."

$72,000. Shumate's sufficiency challenge fails because there was evidence that Wildlife paid $36,000 for each kudu, but one died in transit and another died within forty-eight hours.

**B.      Exemplary Damages**

**1.      Standard of Proof**

Shumate argues that the judgment's award of $200,000 in exemplary damages should be reversed because the jury charge did not fix the standard of proof as clear and convincing evidence for the question on Wildlife's TTLA claim and the question on the amount of exemplary damages. Section 41.003(c) of the Texas Civil Practice and Remedies Code provides:

> If the claimant relies on a statute establishing a cause of action and authorizing exemplary damages in specified circumstances or in conjunction with a specified culpable mental state, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the damages result from the specified circumstances or culpable mental state.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(c).

Wildlife argues that Shumate waived his argument by not including it in his post-judgment motions. Even if not waived, Shumate's challenge, according to Wildlife, fails to appreciate that the jury found, by clear and convincing evidence, he committed fraud. Wildlife references *Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012), for its holding that "[a] claim of theft made in connection with a contract, however, requires proof of more than an intent to deprive the owner of property and subsequent appropriation of the property. In that circumstance, the State must prove that the appropriation was a result of a false pretext, or fraud." Wildlife emphasizes that the jury found, by clear and convincing evidence, Shumate committed fraud.

The predicate instruction and question allowing for the consideration of exemplary damages in the jury charge provide in relevant part:

> Answer the following question regarding Frank Thomas Shumate, Jr. only if you unanimously answered "Yes" to Question Nos. 6 [fraud] and/or 12 [TTLA].

Otherwise, do not answer the following question regarding Frank Thomas Shumate, Jr.

. . .

Question No. 15

Do you find by clear and convincing evidence that the harm to Wildlife Partners, LLC resulted from fraud and/or malice?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No."
*Yes*

Under *Wirth* and in light of Shumate's failure to preserve his disjunctive submission issue, discussed below, the jury charge may be read as finding that Shumate committed fraud by clear and convincing evidence. As for Shumate's argument that the jury awarded exemplary damages on less than clear and convincing evidence, the closet arguments in Shumate's post-judgment motions provide: (a) "No evidence supports any element of the jury's finding in Question 16[, the exemplary damages question], including elements 16(1), (2), (3), (4), (5), or (6)[;]" and "Factually insufficient evidence supports any element of the jury's finding in Question 16, including elements 16(1), (2), (3), (4), (5), or (6)." These arguments failed to apprise the trial court of the issue that Shumate now raises, so the issue is not preserved. *See Oscar Renda Contracting, Inc. v. Bruce*, 689 S.W.3d 305, 311 (Tex. 2024) ("Renda Contracting filed a written pleading objecting to a proposed judgment for exemplary damages, specifically identifying the jury's lack of unanimity. The issue was thus properly before the trial court — and, in fact, Renda Contracting prevailed on this issue."); *see also* TEX. R. APP. P. 33.1(a)(1)(A) (providing that a complaint must "state[] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint . . . .").

## 2. Disjunctive Submission

Shumate complains that the use of "and/or" in Question 15 and its predicate instruction, detailed above, is fatally defective because it does not fully comply with Chapter 41 of the Texas Civil Practice and Remedies Code. Shumate complains that Wildlife cannot establish that the jury unanimously agreed that he: (1) committed fraud by a material misrepresentation; (2) committed fraud by a failure to disclose; (3) committed theft; or (4) acted with malice. He references our decision in *J & C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 640 (Tex. App.—San Antonio 1993, no writ), wherein the alleged negligence of a defendant driver and his employer were submitted on one line:

> Did the negligence, if any, of those named below proximately cause the occurrence in question?
>
> Answer "Yes" or "No" for each of the following:
>
> a.  Javier Guillermo Gonzales *or* J & C Drilling Company      Yes
> b.  Roman Salaiz

*Id*. (Emphasis added). We observed that "[b]ecause the focus of the error asserted is on the judgment rather than the jury charge, error was properly preserved by J & C and Gonzales's supplemental motion for judgment notwithstanding the verdict and motions for new trial." *Id*.

Wildlife argues Shumate's reliance on *J & C Drilling* is misplaced because the jury's answers in that case did not afford a basis upon which to enter judgment against a particular defendant. Indeed, we noted that "[e]ven if we were to hold that Gonzales was negligent as a matter of law, we cannot attribute any particular percentage of responsibility to Gonzales as a matter of law." *Id*. at 641. Wildlife contends that the same concern is not present here because Question 15 is directed at only Shumate. Instead, Wildlife asserts that theories of liability under Section 41.003(a) may be submitted disjunctively, as they are articulated in the statute. *See* TEX.

CIV. PRAC. & REM. CODE ANN. § 41.003(a) (emphasis added) (providing that "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; *or* (3) gross negligence.").

Apportioning liability between two defendants is not an issue in this case because Question 15 addressed only Shumate's conduct. Accordingly, *J & C Drilling* is not dispositive. Liberally construing Shumate's briefing, the only other framework he posits for error being preserved at the post-judgment stage is *Oscar Renda*, 689 S.W.3d at 311. In *Oscar Renda*, post-judgment motions were held to have preserved the appellant's complaint that the trial court could not render a judgment awarding exemplary damages on a non-unanimous verdict. *Id*. It was not, as Shumate posits, that "the plaintiff always bears the burden to obtain all findings required by Chapter 41, and this cannot be waived by failing to object." Nothing in *Oscar Renda* suggests that an award of exemplary damages on a unanimous verdict would have been erroneous only because of the missing Section 41.003(e) unanimity instruction. *Cf. id*. at 313 ("Jury verdicts are often unanimous even when they need not be . . . The charge as given did not disallow a unanimous verdict — it merely increased the likelihood that the jury would render a verdict that would not support a claim for exemplary damages.").

Returning to the statute, Section 41.003(a) allows for the recovery of exemplary damages that result from: (1) fraud; (2) malice; *or* (3) gross negligence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (emphasis added). Shumate has no quarrel that the statue allows for recovery of exemplary damages on a finding of malice. Instead, the confusion argument he raises would have been present at the charge conference. In light of the plain text of the statute and the briefing

before us, it was incumbent on Shumate to articulate to the trial court at the charge conference why the disjunctive submission was in error.[6]

### 3. TTLA Bar

Shumate argues the TTLA's statutory allowance for an award of $1,000 constitutes a "penalty" under Section 41.002(b) of the Texas Civil Practice and Remedies Code, and it thereby precludes an award of exemplary damages. Section 134.005(a)(1) provides:

(a) In a suit under this chapter, a person who has sustained damages resulting from theft may recover:

  (1) under Section 134.003(a), from a person who commits theft, the amount of actual damages found by the trier of fact and, *in addition to actual damages*, damages awarded by the trier of fact in a sum not to exceed $1,000;

TEX. CIV. PRAC. & REM. CODE ANN. § 134.005(a)(1) (emphasis added). Section 41.001(5) defines "exemplary damages" within Chapter 41 as "any damages awarded as a *penalty* or by way of punishment but not for compensatory purpose. Exemplary damages are neither economic nor noneconomic damages." *Id.* § 41.001(5). The phrase "includes punitive damages." *Id.* Section 41.002(b) provides that Chapter 41 "establishes the maximum damages that may be awarded in an action subject to this chapter, including an action for which damages are awarded under another law of this state." *Id.* § 41.002(b). Section 41.002(b) also provides that Chapter 41 "does not apply to the extent another law establishes a lower maximum amount of damages for a particular claim." *Id.* Shumate analogizes Section 134.005(a)(1)'s allowance for an additional award of up to $1,000 as the award of treble damages under the Texas Deceptive Trade Practices Act ("DTPA"). Indeed, the Texas Supreme Court has held that "a DTPA treble-damage award could not be recovered . . . because treble damages under the DTPA are punitive damages." *PPG Indus.,*

---

[6] Because of our disposition, we need not address Shumate's complaint that the evidence is legally and factually insufficient to support a finding of malice.

*Inc. v. JMB/Houston Centers Partners Ltd. P'ship*, 146 S.W.3d 79, 89 (Tex. 2004) (internal citation and quotation marks omitted).

Wildlife argues that Shumate's analogy is misplaced because the DTPA expressly precludes exemplary damages. *See* TEX. BUS. & COM. CODE ANN. § 17.50(g) ("Chapter 41, Civil Practice and Remedies Code, does not apply to a cause of action brought under this subchapter.").

We conclude that Shumate's analogy is misplaced. Shumate directs us to no statutory provision in the TTLA that is akin to the one in the DTPA.

### 4. Specific Conduct

Shumate argues that "Wildlife did not submit or prove any theory that would support assessing [exemplary] damages against him for [Gracia's] conduct." Shumate argues that Garcia "was a low-level employee of Superior Ready Mix, a company associated with Shumate." He references *Qwest Intern. Comm'ns., Inc. v. AT & T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005), for its observation that "the decisions of lower-level employees" formed the basis of the jury's malice findings. Wildlife argues that "[t]he jury found that Shumate personally committed fraud . . . and theft . . . and found by clear and convincing evidence that [Wildlife's] harm was the result of Shumate's actions . . . ."

We have already rejected Shumate's sufficiency challenges on the jury's finding that Shumate himself committed fraud and theft. For those reasons, Shumate's sufficiency challenge fails.

### 5. Due Process

Shumate argues that the jury's award of $200,000 violates federal due process guarantees because the dispute was over only $36,000. He references *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008), for the proposition, as he puts it, that "[p]unitive damages should seldom exceed

a one-to-one ratio." Shumate contends that "the evidence only shows a partially performed business deal involving a dispute over $36,000." Wildlife argues that the ratio should be keyed to the jury's finding of $72,000 in actual damages, such a finding yields an actual to exemplary damages ratio of 2.78:1, and that such a ratio coupled with findings of fraud comports with federal due process guarantees.

Shumate's reliance on *Exxon Shipping* is misplaced. In *Exxon Shipping*, the U.S. Supreme Court held that "given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit *in such maritime cases*." *Id*. (Emphasis added). Instead, our federal due process analysis is focused on "guideposts:" (1) the nature of the defendant's conduct, (2) the ratio between exemplary and compensatory damages, and (3) the size of civil penalties in comparable cases. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308 (Tex. 2006) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).

We have already rejected Shumate's sufficiency challenges to the jury's finding that Shumate committed fraud. Moreover, Shumate fails to appreciate that the jury found actual damages in this case were $72,000 rather than $36,000. The ratio of 2.78:1 does not violate federal due process guarantees. *See id*. ("[T]he Court has pointed to early statutes authorizing awards of double, treble, or quadruple damages as support for the conclusion that 'four times the amount of compensatory damages might be close to the line of constitutional impropriety.'") (quoting *Campbell*, 538 U.S. at 425).

We overrule Shumate's fourth issue.

## VII. ATTORNEY'S FEES

Kevin Young, the managing partner at Prichard Young ("the firm"), the law firm that represented Wildlife, testified in support of Wildlife's request for attorney's fees. Young reviewed the billing records, pleadings, and discovery in the case. Young testified that Daivd Prichard, Wildlife's lead counsel, has charged as much as $750 per hour for "big clients" on "really big cases." In this case, "for whatever reason," Prichard agreed to represent Wildlife for $400 an hour. The two other timekeepers on the case included an associate at the firm who charged $350 an hour, and a paralegal who charged $125 an hour. Young noted that the case began in April 2022. Since the case's inception and up until the month preceding trial, Young calculated that David Prichard had billed sixty hours, an associate had billed 392 hours, and a paralegal had billed 124 hours. For trial, Young estimated that each of the three timekeepers would bill forty hours for the week of trial. Young also factored in $16,000 in costs. In total, Young estimated that the firm had billed Wildlife $281,227 in attorney's fees.

The legal bill was "high," according to Young, but he attributed its amount to Shumate's behavior in three specific instances. First, Young noted that, at the case's inception, Shumate evaded service of citation. This necessitated the hiring of a private investigator, who located Shumate in Florida. It also necessitated the filing of and a hearing on Wildlife's motion for alternative service. Second, Shumate resisted Wildlife's discovery requests to the point where Wildlife filed three separate motions to compel. These three motions also necessitated three separate hearings. Third, as with the written discovery, Shumate resisted being disposed. This too necessitated a motion, hearing, and finally an order compelling Shumate's deposition.

Young conceded four instances where legal fees were incurred that were not directly related to the claims Wildlife presented to the jury. First, Young acknowledged that work billed

on preparing claims of negligence and potential violations of the Texas Deceptive Trade Practices Act ("DTPA") did not allow for the recovery of attorney's fees. Second, Young testified that Wildlife's attorneys researched and two firm attorneys attended bankruptcy proceedings that involved business entities associated with Shumate. Young acknowledged that the bankruptcy proceedings had "nothing" to do with the instant lawsuit. Third, Wildlife's attorneys also reviewed an opinion issued by the Texas Supreme Court that involved Shumate. Young maintained that these charges constituted reasonable "intel work" on an opposing party. Fourth, Young acknowledged that if some of Wildlife's discovery responses needed to be amended because the original responses contained inaccurate information, then that work should only have been billed once. Young deducted sixty-five hours for activities that he believed would not be recoverable. This deduction yielded a total request of $252,000 for Wildlife's legal representation through the time of trial.

## A.     Attorney's Fees through Trial

In *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019), the Texas Supreme Court held that "the fact finder's starting point for calculating an attorney's fee award is determining the reasonable hours worked multiplied by a reasonable hourly rate, and the fee claimant bears the burden of providing sufficient evidence on both counts." *Id*. (citing *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012)). "Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.*. While contemporaneous billing records are not required to prove that the requested fees are reasonable and necessary, the Texas Supreme Court has cautioned that "billing records are *strongly*

encouraged to prove the reasonableness and necessity of requested fees when those elements are contested." *Id*. at 502. (Emphasis in original).

Shumate acknowledges that Wildlife presented evidence on the fifth *Rohrmoos* factor — the reasonable hourly rate for each person performing such services. *Id*. at 498. However, he argues that Wildlife offered no evidence of the first four *Rohrmoos* factors. *Id*. Wildlife argues Young testified to both the reasonableness and necessity of the work performed.

Our survey of Young's testimony, detailed above, reveals that Wildlife failed to present legally sufficient evidence on the first four *Rohrmoos* factors. We gather, from context, that Wildlife provided Shumate with billing records. However, Wildlife did not offer these billing records into evidence. Young's testimony about issues with serving Shumate with citation, three instances of written discovery disputes, and one instance of coordinating Shumate's deposition relates to broad categories of work performed or general tasks that, without more, have been held to be insufficient under *Rohrmoos*. For example, in *Intertek USA, Inc. v. Trical Commercial Investments, LLC*, No. 14-23-00475-CV, 2025 WL 2496264, at *11 (Tex. App.—Houston [14th Dist.] Aug. 29, 2025, no pet. h.) (substituted mem. op.), a prevailing party's lead attorney "identified several broad categories of work performed — depositions, sorting through discovery, filing motions, serving subpoenas, preparing for trial — either by him [or] someone else at his firm. . . ." However, the Fourteenth Court of Appeals concluded that "it is impossible to discern who spent how much time performing these broad categories of work and the discrete tasks subsumed within these broad categories." *Id*. While Young broke down how much time David Prichard and an associate billed, he provided no facts about how much time was billed for each broad category much less the discrete tasks subsumed within the broad categories of work performed. *See id*.; *Westheimer v. Ziemer*, 702 S.W.3d 621, 632 (Tex. App.—Houston [1st Dist.]

2024, no pet.) ("While [prevailing party's counsel] identified several broad categories of work performed — written discovery, document production, depositions, motion practice, trial preparation, and trial — either by him or someone else at his firm, it is impossible to discern who spent how much time performing these broad categories of work, let alone discern the discrete tasks subsumed within these broad categories."); *Eason v. Deering Constr., Inc.*, No. 02-19-00310-CV, 2020 WL 7062687, at *8 (Tex. App.—Fort Worth Dec. 3, 2020, no pet.) (mem. op.) ("While [prevailing party's] counsel testified to the aggregate amount of fees and the general tasks carried out by himself and his two associates, this sort of evidence has been held to be insufficient.").

Accordingly, under *Rohrmoos*, we conclude that Wildlife presented legally insufficient evidence regarding (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, and (4) the reasonable amount of time required to perform the services. *See Rohrmoos Venture*, 578 S.W.3d at 505 ("Without detail about the work done, how much time was spent on the tasks, and how [counsel] arrived at the $ 800,000 sum, [counsel's] testimony lacks the substance required to uphold a fee award.").

B.      **Attorney's Fees on Appeal**

Regarding Wildlife's request for conditional appellate fees, Young testified that the firm employs a lawyer with a "special certification" who would handle the instant appeal. That lawyer charges $400 an hour. Young described preparation of the brief as:

> So they[, the appellate courts,] require — you know, you can't just say, hey, here's the trial, what do you think? You have to brief it. You have to put it in their format. There's a lot of things you have to do when you file an appeal. So you have to not only summarize how the trial went but then put in all of the law, the Texas law as to here is why we believe the jury was right. And each side has to do that.

Young opined that it would take 150 hours for representation through the court of appeals, for a total of $60,000. Young opined that a fee for a merits brief "would be the [$]20,000 you see there

on that box."[7]   The jury awarded $60,000 for proceedings through the court of appeals, $25,000 for representation before the Texas Supreme Court on a petition for review, $20,000 to prepare a brief on the merits, and $10,000 to present an oral argument.

Shumate argues that Wildlife offered insufficient evidence to support an award of appellate attorney's fees.  In *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020), the Texas Supreme Court observed:

> As we explained in *Rohrmoos Venture*, however, "[i]t should have been clear from our opinion[ ] in *El Apple*" that the lodestar analysis applies to situations "in which an objective calculation of reasonable hours worked . . . can be employed."  578 S.W.3d at 498.

> That is not the situation with respect to contingent appellate fees, which have not yet been incurred and thus must be projected based on expert opinion testimony. *See Ventling v. Johnson*, 466 S.W.3d 143, 156 (Tex. 2015) ("An award of [contingent] appellate attorney's fees to a party is essentially an award of fees that have not yet been incurred . . . .").  At the point when fees are awarded by the trial court, any appeal is still hypothetical. *See id*.  There is no certainty regarding who will represent the appellee in the appellate courts, what counsel's hourly rate(s) will be, or what services will be necessary to ensure appropriate representation in light of the issues the appellant chooses to raise.

> Of course, this uncertainty does not excuse a party seeking to recover contingent appellate fees from the need to provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services.

In *Muniz v. Dugi*, No. 04-20-00528-CV, 2022 WL 1479052, at *9 (Tex. App.—San Antonio May 11, 2022, no pet.) (mem. op.), the appellee's attorney testified: "In the event this case is appealed, additional fees [of] $20,000 would be incurred to the Fourth Court of Appeals. If it went from the Fourth Court of Appeals to the Supreme Court, I think a like fee would be charged, though I do not think this is a case that would go that far."  We observed that "[w]hile [appellee's counsel] provided evidence of his reasonable hourly rate, he did not provide opinion

---

[7] As with Young's testimony regarding attorney's fees in the trial court, Young's testimony references a demonstrative exhibit that was not admitted into evidence.

testimony on the services he reasonably believes will be necessary to defend the appeal." *Id.* We held that this was insufficient under *Yowell*. *Id.*

In this case, Young testified as to a reasonable hourly rate, which Shumate does not contest, the number of hours he anticipates are necessary to represent Wildlife through an intermediate appellate court, and the amount of fees requested for each stage of the appellate process. We conclude that Young's testimony about "summariz[ing] how the trial went but then put[ting] in all of the law" is too cursory to have informed the jury about "the services [Wildlife] reasonably believes will be necessary to defend the appeal[.]" *Yowell*, 620 S.W.3d at 355; *see also Muniz*, 2022 WL 1479052, at *9.

We sustain Shumate's fifth issue.[8]

### III. CONCLUSION

We reverse the final judgment's award of attorney's fees and remand Wildlife's request for these attorney's fees for further proceedings consistent with this opinion. We affirm the remaining portions of the final judgment.

Rebeca C. Martinez, Chief Justice

---

[8] "Because attorney's fees were authorized but the evidence was insufficient under *Rohrmoos* to support the amounts awarded, the proper remedy is to reverse the awards and remand the case for a new hearing on fees." *Porter v. Porter*, No. 04-20-00229-CV, 2021 WL 2117923, at *5 (Tex. App.—San Antonio May 26, 2021, no pet.) (mem. op.).